789 So.2d 896 (1999)
Frederick D. WOODS
v.
STATE.
CR-97-0027.
Court of Criminal Appeals of Alabama.
December 10, 1999.
Rehearing Denied January 28, 2000.
*900 Bryan A. Stevenson and Cathleen I. Price, Montgomery, for appellant.
*901 Bill Pryor, atty. gen., and Michelle Riley Stephens, asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, Frederick D. Woods, was convicted of murder made capital because the murder was committed during the course of a robbery. See § 13A-5-40(a)(2), Code of Alabama 1975. The jury, by a vote of 10-2, recommended that Woods be sentenced to death. The trial court accepted the jury's recommendation and sentenced Woods to death by electrocution.
The State's evidence tended to show the following. On September 10, 1996, police were called to the Mountain Top Beverage Store, a convenience store near Ashville, where they discovered the body of its owner, Rush "Doc" Smith, slumped behind the counter, dead from a gunshot wound to the head. Testimony indicated that between $200 and $300 was missing from the cash register and that several bottles of liquor had also been taken from the store. An autopsy revealed that Smith received a single gunshot wound to the right side of his head. Forensic testing showed that the bullet, which had fragmented upon impact, was a .38 caliber.
Louis Bernard Jones testified that he, Woods, and Richard Foreman,[1] were driving around in his Ford LTD automobile and smoking crack cocaine on the evening of September 10 when Woods asked to borrow Jones's car so that he could go to a local convenience store to buy some antacid for his girlfriend. Jones testified that he always kept a loaded .38 caliber revolver under the driver's seat of his car. Woods and Foreman left, and Woods was driving. Jones further testified that when Woods and Foreman returned, approximately one hour to an hour and a half later, Woods was acting unusual and was "moping." Jones said that at some point in their conversation he asked Woods if he had shot a man with his gun and he replied that he had. Testimony established that after borrowing Jones's car, the two went to the Rainbow Food Mart in Ashville where Woods purchased two pairs of gloves. They left the store around 9:30 p.m. Police were called to the Mountain Top Beverage Store at around 11:40 p.m.
Woods confessed to murdering Smith; he handwrote a three-page confession. He wrote that he was smoking crack cocaine and that he needed cash to buy more drugs when he thought of Smith. Woods wrote that he pointed the gun at Smith, closed his eyes, and when he opened them Smith was on the floor. Woods then went around the counter and took the money out of the register.
Woods also led police to where he had disposed of the gloves he wore during the robbery-murder. Further, DNA testing done on the bloodstain found on the shirt that Woods was wearing at the time of the murder matched Smith's blood.

Standard of Review
Because Woods has been sentenced to death, this Court is required to search the record for any plain error that may have "adversely affected the substantial right of the appellant." See Rule 45A, Ala. R.App.P. "`[T]he plain-error exception to *902 the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)." Ex parte Williams, 710 So.2d 1350, 1355 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).

Pretrial Issues

I.
Woods first argues that the trial court erred in denying his application for treatment under the Youthful Offender Act ("the Act"). Section 15-19-1, Code of Alabama 1975, states:
"(a) A person charged with a crime which was committed in his minority but was not disposed of in juvenile court and which involves moral turpitude or is subject to a sentence of commitment for one year or more shall, and, if charged with a lesser crime may be, investigated and examined by the court to determine whether he should be tried as a youthful offender; provided he consent to such examination and to trial without a jury where trial by jury would otherwise be available to him. If the defendant consents and the court so decides, no further action shall be taken on the indictment or information unless otherwise ordered by the court as provided in subsection (b) of this section.
"(b) After such investigation and examination, the court, in its discretion, may direct that the defendant be arraigned as a youthful offender, and no further action shall be taken on the indictment or information; or the court may decide that the defendant shall not be arraigned as a youthful offender, whereupon the indictment or information shall be deemed filed."
The Youthful Offender Act further provides that the maximum sentence that may be fixed under the Act is three years in the custody of the Board of Corrections. Section 15-19-6(a)(4), Code of Alabama 1975.
Although there is no right to automatic treatment as a youthful offender, an accused has a right to request to be considered a youthful offender. Lochli v. State, 565 So.2d 294 (Ala.Cr.App.1990). We have also stated that the Youthful Offender Act applies to all crimes ranging from "`petit larceny to murder in the first degree.'"[2]Pressey v. State, 597 So.2d 1385, 1386 (Ala.Cr.App.1992), quoting Watkins v. State, 357 So.2d 156, 161 (Ala.Cr. App.1977), cert. denied, 357 So.2d 161 (Ala. 1978).
Here, the trial court ordered an investigation into Woods's background and a probation report was prepared.[3] The record reflects that the trial court examined the report and denied the application for *903 youthful offender treatment. This Court in Mansel v. State, 716 So.2d 234, 235 (Ala.Cr.App.1997), stated the following about reviewing a trial court's ruling on an application for youthful offender treatment:
"`The trial court has almost absolute discretion in ruling on applications for youthful offender status, and the actions of the trial judge are presumptively correct in the absence of a showing to the contrary.' Carden v. State, 621 So.2d 342, 345 (Ala.Cr.App.1992).
"`"When deciding whether to grant youthful offender status, it is expected that the nature of the crime charged, along with prior convictions of the defendant, will be considered, as well as any other matters deemed relevant by the court. No prescribed format is required. Neither is the trial court required to articulate on the record the reasons for denying youthful offender status to a defendant."'
"Self v. State, 512 So.2d 811, 814 (Ala.Cr. App.1987), quoting Goolsby v. State, 492 So.2d 635, 636 (Ala.Cr.App.1986) (citations omitted).
"`It is sufficient if the order of denial reflects that some investigation, examination, or inquiry was conducted before the application for youthful offender status was denied. Talley v. State, 504 So.2d 741, 742-43 (Ala.Cr. App.1987). A formal hearing on an application for youthful offender status is not required. Garrett v. State, 440 So.2d 1151, 1152 (Ala.Cr.App. 1983). Where it does not affirmatively appear that the trial court's decision was arbitrary or that it was made without any examination or investigation, there is no basis for overturning the trial court's decision. Wilson v. State, 563 So.2d 11, 12 (Ala.Cr.App. 1989).'
"Carden, 621 So.2d at 345."
See also Hyde v. State, 778 So.2d 109 (Ala.Cr.App.1998); J.F.B. v. State, 729 So.2d 355 (Ala.Cr.App.1998); Smith v. State, 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993). The record reflects that the trial court complied with the law as set out in Mansel. No error occurred here.

II.
Woods next argues that his indictment should have been quashed because, he says, the venire from which the grand and petit juries were chosen failed to reflect a fair cross-section of the community. He further asserts that the indictment should have been quashed because, he says, the names of the grand and petit jurors were improperly drawn from the county as a whole and not solely from the Ashville Division, where the robbery-murder occurred.
The only evidence in the record concerning this contention is the following, which occurred at a motion hearing:
"The Court: ... Motion to Quash Petit Jury Venire
"Mr. Vandall [defense counsel]: That motion is based on the jury venire of 124 names, as it was drawn on the 3rd of August. I have a certified copy of that provided list that I would add as an exhibit to this motion.
"The Court: Well, the jury venire is the jury venire.
"Mr. Vandall: We have some law as to this. This particular venire, as it was originally drawn, contained 124 names. There were only 7 African-Americans on that entire list of 124. There is some caselaw that

*904 "The Court: I know the caselaw, but what are the facts?
"Mr. Vandall: That is a statistically insufficient number of black people of the St. Clair County population.
"The Court: What is the number of African-American population of jury service age in St. Clair County?
"Mr. Vandall: That, I cannot tell the Court.
"The Court: What evidence do you have there has been a systematic exclusion of African-Americans from the jury systems in St. Clair County?
"Mr. Vandall: The numbers themselves.
"The Court: That is all the evidence you have?
"Mr. Vandall: That is all.
"The Court: Overruled."
This Court in Benefield v. State, 726 So.2d 286 (Ala.Cr.App.1997), quoting Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), stated:
"`[I]n Duren [v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1979) ], the Court stated:
"`"In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process."'"
726 So.2d at 291, quoting Ex parte Land, 678 So.2d 224, 244 (Ala.1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
We have held that blacks "`are members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws.'" Rutherford v. State, 612 So.2d 1277 (Ala.Cr. App.1992), quoting Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Woods also furnished evidence that of the 124 prospective jurors called for jury service, only 7 were black. However, Woods presented no evidence concerning the other factors articulated in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). There is absolutely no evidence of the percentage of blacks that comprise the population of St. Clair County as a whole. Nor was any evidence presented concerning St. Clair County's method of selecting prospective grand and petit jurors. Woods failed to meet his burden of establishing a prima facie case of a violation of the fair cross-section requirement.
Woods further argues that his indictment should have been quashed because the grand jury that indicted him, and the jury that convicted him, was unlawfully drawn from all of the residents of St. Clair County and not solely from the particular division of the county where the crime occurred, the Ashville Division. He contends that this unlawful jury selection violates his constitutional protections under Article I, § 6, Ala. Const. 1901, which provides, in pertinent part:
"That in all criminal prosecutions, the accused has a right to ... a speedy, public trial, by an impartial jury of the county or district in which the offense was committed ...."
(Emphasis added.)
This very issue was addressed by this Court in a mandamus petition filed by Woods's codefendant, Richard Foreman. See Ex parte Foreman, 715 So.2d 235 (Ala.Cr.App.1998). This Court in Foreman, *905 after evaluating the relevant acts of Alabama that established the divisions in St. Clair County, stated: "The act creating two divisions in St. Clair County, Act No. 53, Acts of Alabama 1907, does not violate Art. I, § 6, Alabama Constitution of 1901, and prospective jurors for each division can properly be called from the county at large."

III.
Woods next argues that he was denied his right to due process, his right to a fair trial, and his right to confront the witnesses against him, by the State's failure to transcribe the grand jury proceedings. This identical issue has previously been addressed and rejected by this Court.
"[The defendant] further contends that his conviction should be reversed because the grand jury proceedings in his case were not recorded. He argues that the failure to record the testimony of witnesses appearing before the grand jury in his case denied him the right to adequately cross-examine and to impeach the witnesses testifying against him, to identify constitutional errors related to the grand jury proceedings, and to have an adequate record for appeal. He does not assert that any particular witness's testimony at trial was inconsistent with that witness's testimony before the grand jury. Rather, he complains that because he was unable to review the grand jury testimony because it was not recorded, he was unable to identify possible contradictory prior statements that would have enabled him to impeach prosecution witnesses. No objection was raised in the trial court concerning the failure to record the grand jury proceedings. Thus, we review this issue under the plain error rule. In this case, the testimony of the witnesses before the grand jury that returned the indictment against [the defendant] was not recorded.
"In Alabama there is no statute requiring that testimony before a grand jury be recorded. `A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779. There is no such statute in this state.' Sommerville v. State, 361 So.2d 386, 388 (Ala.Cr. App.), cert. denied, 361 So.2d 389 (Ala. 1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit."
Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___, ___ (Ala.Cr.App. 1999).
We note that Woods did not request a transcript of the grand jury proceedings until months after he was indicted. The prosecutor responded that the grand jury proceedings were not recorded in St. Clair County. As this Court held in Drinkard v. State, 777 So.2d 225, 258 (Ala.Cr.App. 1998), rev'd on other grounds, 777 So.2d 295 (Ala.1999):
"We find no plain error in the failure to record the grand jury proceedings. Alabama law does not require that grand jury proceedings be recorded. Section 12-17-275, Code of Alabama 1975, provides `[w]hen directed by the judge' an official court reporter `shall attend the investigations of the grand jury and there take such notes of the testimony as directed by the district attorney or foreman.' (Emphasis added.) *906 Furthermore, even if the grand jury proceedings should have been recorded, the appellant did not make the requisite showing that he was entitled to inspect the transcript of the proceedings. See Arthur v. State, 711 So.2d 1031 (Ala.Cr. App.1996), aff'd, 711 So.2d 1097 (Ala. 1997)."
(Emphasis in original.)

IV.
Woods next argues that the indictment charging him with robbery-murder was vague and failed to apprise him of the charges against him. Specifically, he contends that the indictment failed to state the amount of money taken in the robbery-murder. This issue was not brought to the trial court's attention; thus, our review is limited to whether plain error occurred. Rule 45A, Ala.R.App.P.
The indictment against Woods read as follows:
"The Grand Jury of said County charges that before the finding of this Indictment Frederick D. Woods did intentionally cause the death of Roaul Rush Smith, by shooting him with a pistol, and Frederick D. Woods caused said death during the time that Frederick D. Woods was in the course of committing a theft of U.S. Currency and alcoholic beverages, the property of Roaul Rush Smith by the use of force against the person of Roaul Rush Smith, with intent to overcome his physical resistance or physical power of resistance, while the said Frederick D. Woods was armed with a deadly weapon to-wit: a pistol, in violation of Code of Alabama 1975, 13A-5-40(a)(2)."
(Emphasis added.) Woods argues on appeal that "alleging a theft of `U.S. Currency' is insufficient to inform Mr. Woods of the nature of the charge against him." We do not agree.
This Court in Seawright v. State, 479 So.2d 1362, 1368 (Ala.Cr.App.1985), addressing an identical issue, stated:
"Prior to adoption of the present robbery statutes, there was no statutory robbery provision in this state and the common law prevailed. See Williams v. State, 48 Ala.App. 737, 267 So.2d 526 (1972). `The criminal code definition of robbery has thus altered the common law definition. When robbery was made a statutory offense, the test for the sufficiency of a robbery indictment was changed. The indictment is judged by the statutory language and elements instead of the former common law elements.' Smith v. State, 446 So.2d 68, 72 (Ala.Crim.App.1984).
"In Grace v. State, 431 So.2d 1331, 1333 (Ala.Crim.App.1982), this court stated:
"`Common law robbery required a "taking" of property from the person of another. Wilson v. State, 268 Ala. 86, 105 So.2d 66 (1958), although the amount of value of the property taken was immaterial, Sanders v. State, 289 Ala. 224, 266 So.2d 802 (1972); Harris v. State, 44 Ala.App. 449, 212 So.2d 695 (1968).
"`The present robbery statutes, however, do not require a "taking" of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App.1981); Ala.Code §§ 13A-8-40 through 13A-8-44 (1975) (Commentary), so that not only is the value of the property immaterial, but also the indictment need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are "in the course of committing a theft," which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual "taking from the person."' (Emphasis added.)"
*907 See also Freeman v. State, 722 So.2d 806 (Ala.Cr.App.1998). The indictment in this case was not deficient for failing to allege the amount of money allegedly taken in the robbery.

Guilt-Phase Issues

V.
Woods argues that the trial court erred in failing to grant his motion for a change of venue because of allegedly prejudicial media coverage of the case. Woods's complete argument in his brief to this Court consists of the following:
"Mr. Woods's trial was held in St. Clair County, which has a population of about 50,000 people. Both the written and the broadcast media in and around St. Clair county extensively covered the crime with which Mr. Woods was charged. (R. 65) Several members of the venire indicated that they were familiar with this coverage. (R. 142, 148, 207, 209).
"In spite of the extensive coverage of this case, and the evidence that several members of the voir dire had been exposed to it, the trial court did not order a change of venue in this case. It's failure to do so was erroneous, and worked a violation of Mr. Woods's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair trial by a impartial jury, free from outside influence."
Rule 10.1, Ala.R.Crim.P., which governs motions for a change of location of a trial, states in part:
"(a) Grounds. In any criminal case prosecuted by indictment or on appeal for trial de novo in which a jury is demanded, the defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and an unbiased verdict cannot be had for any reason. The court may change the place of trial in any criminal case if trial in the original county poses a clear and present danger to the defendant from mob violence.
"(b) Burden of Proof. The burden is upon the defendant to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried."
Woods presented no evidence at trial in support of this contention, aside from his motion for a change of venue. He presented no newspaper articles or other exhibits detailing the publicity around the case. This Court's only means of reviewing this contention is by evaluating the voir dire examination of the prospective jurors. We note that Woods never argued that any jurors who were not struck should have been struck because of any bias based on prejudicial pretrial publicity. In Hardy v. State [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___, ___ (Ala. Cr.App.1999), we stated the following concerning a defendant's burden of proof when moving for a change of venue:
"The burden of proof is on the defendant to `show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.' Rule 10.1(b), Ala.R.Crim.P. Hardy failed to meet this burden. `Rather, he has simply made bare allegations that there was prejudicial pretrial publicity and that this publicity biased the jurors' and thus `did not show that he could not receive a fair trial.' Hyde v. State, 778 So.2d 199, 232 (Ala.Crim.App.1998). See also Henderson v. State, 612 So.2d 1256, 1258 (Ala.Crim.App.1992) (`A bare allegation is not sufficient to prove that the defendant was actually prejudiced or *908 that the community was so saturated with prejudicial publicity as to render the trial setting inherently suspect.'); Callahan v. State, 557 So.2d at 1306 (`Having produced no evidence, Callahan failed to demonstrate any prejudice, or even that pretrial publicity actually existed, and the trial court properly denied his motion on that ground.'). The trial court did not abuse its discretion in denying hardy's motion for a change of venue."
On appeal Woods makes only a general assertion that he was entitled to a change of venue based on pretrial publicity. There is no allegation on appeal that any prospective juror should have, and was not, struck because of his/her exposure to alleged prejudicial pretrial publicity. The Alabama Supreme Court in Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), issued explicit guidelines concerning a trial court's consideration of a motion for change of venue based on pretrial publicity.
"In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala. Crim.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)."
See also Whitehead v. State, 777 So.2d 781 (Ala.Cr.App.1999).
Here, the prospective jurors who indicated that they had heard about the case were questioned individually. Each indicated that anything they knew about the case would not affect their ability to be impartial. Woods has failed to meet his burden of establishing that he was entitled to a change of venue based on pretrial publicity.

VI.
Woods next argues that the trial court erred in limiting his voir dire examination to one hour per panel. There is no indication in the record that this issue was ever presented to the trial court. Therefore, our review is limited to determining whether there was plain error. Rule 45A, Ala.R.App.P.
The record reflects that the entire group of prospective jurors was questioned with general voir dire examination by the trial court. The venire was then split into three panels of sixteen. The trial court then stated the following, "What we are going to do at this point, because of the *909 nature of the questioning we have to do, we are going to break you down into three groups, and we will ask questions of the groups one at the time. The first group, we will start now. The second group, we will start with you at 2:15. The third group at 3:15."
There is no indication in the record that Woods was limited in his voir dire questioning. There is also no evidence that during voir dire Woods was forced to desist because of the time limitation placed by the court. There is nothing in the record that suggests that the time limitation affected Woods's voir dire. Woods did not indicate to the trial court that he was unable to adequately perform voir dire in the time allotted. Furthermore, on appeal Woods points to no questions he was not allowed to ask because of the time limitation.
"It is well settled that the trial court has discretion regarding how the voir dire examination of the jury venire will be conducted, and that reversal can be predicated only upon an abuse of that discretion. Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied, 399 So.2d 899 (Ala.1981); Peoples v. State, 375 So.2d 561 (Ala.Cr.App.1979)."
Bui v. State, 551 So.2d 1094 (Ala.Cr.App. 1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (D.Ala.1991), on remand, 627 So.2d 848 (Ala.), on remand, 627 So.2d 849 (Ala.Cr.App.1991), after remand, 627 So.2d 849 (Ala.Cr.App. 1992), rev'd on other grounds, 627 So.2d 855 (Ala.1992). See also Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990); and Rule 18.4, Ala.R.Crim.P.
Woods also argues that the trial court erred in not allowing individual voir dire examination. The trial court did allow limited individual voir dire when it indicated before general voir dire, "To the extent that any of those general questions reveal particular problem areas, obviously there will be individual questioning because I don't want to taint the remainder of the small panels with that information." As this Court recognized in Whitehead:
"`"In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court." Coral v. State, 628 So.2d 954, 968 (Ala.Cr.App.1992). "The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion." Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App. 1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).'
"Taylor v. State, 666 So.2d 36, 66 (Ala. Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). See also Smith v. State, 727 So.2d 147 (Ala. Cr.App.1998), aff'd, 727 So.2d 173 (Ala. 1999); and George v. State, 717 So.2d 827 (Ala.Cr.App.), aff'd in relevant part, 717 So.2d 844 (Ala.1996), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998). Whitehead offered no evidence in the trial court showing how he was prejudiced as a result of prospective jurors being questioned in panels, as opposed to being questioned individually in a sequestered setting. On appeal, he offers only general arguments *910 concerning the possibility of prejudice and fails to show that any comments by a prospective juror improperly influenced other members of a panel. He has presented no proof that the pretrial publicity was so extensive that the method of voir dire was inadequate to ensure juror impartiality."
777 So.2d at 798. See also Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999); Hardy. This view is incorporated into Rule 18.4(c), Ala.R.Crim.P., which states: "The court shall permit the parties or their attorneys to conduct a reasonable examination of prospective jurors. The court also may conduct an examination of prospective jurors, and the court, in its discretion, may direct that the examination of one or more prospective jurors be separate and apart form the other prospective jurors." (Emphasis added.)
Here, the trial court ordered that the jury be questioned in panels of 16. However, the trial court did allow individual voir dire of those jurors who indicated "particular problem areas." Woods has failed to show how he was prejudiced by the lack of complete individual voir dire.

VII.
Woods next argues that he was entitled to a sequestered jury under Alabama law and that the failure of the trial court to order that his jury be sequestered violated his constitutional rights. Woods cites Rule 19.3(a)(1), Ala.R.Crim.P., for the proposition that before a trial court can order that the jurors be separated the trial court must first obtain the consent of the defendant and his counsel in open court.
The version of Rule 19.3(a)(1) in effect at the time of Woods's trial, read as follows:
"In any prosecution for a capital felony, upon the consent in open court of the defendant, defendant's counsel, and the district attorney, the trial court, in its discretion, may permit the jury trying the case to separate during the pendency of the trial, whether the jury has retired or not."
Rule 19.3, was amended effective December 1, 1997, to read as follows:
"In the prosecution of any felony case, the trial court, in its discretion, may permit the jury hearing the case to separate during the pendency of the trial. Such a separation of the jury shall create a prima facie presumption that the accused was not prejudiced by reason of the separation."
The commentary to the Rule notes that the Rule was amended to make it consistent with § 12-16-9, Code of Alabama 1975. This Code section reads as follows:
"In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate. A motion to separate or sequester shall not be made within the hearing of the jury, and the jury shall not be informed which party, if any, requested separation or sequestration."
Woods recognizes that this Court has held that § 12-16-9, Code of Alabama 1975, which allows a trial court to order a jury to separate on its own motion, repealed the version of Rule 19.3 in effect at the time of Woods's trial. See Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999). However, Woods argues that this Court's decision in Stewart directly contradicts Alabama law and is inconsistent *911 with the history of Rule 19.3 and § 12-16-9. He contends that according to § 12-1-1, a 1977 law, which provides, "Any provisions of this title regulating procedure shall apply only if the procedure is not governed by the Alabama Rules of Civil Procedure, the Alabama Rules of Appellate Procedure or any other rule of practice and procedure as may be adopted by the Supreme Court of Alabama," Rule 19.3, which specifically addresses capital cases takes precedence over § 12-16-9.
However, Woods fails to consider that § 12-16-9 was amended in 1995, after the adoption of Rule 19.3. The amendment eliminated the distinction between capital and noncapital cases. This Court very thoroughly addressed this issue in Stewart, 730 So.2d at 1215-16, and stated:
"Before it was revised, § 12-16-9, Ala. Code 1975, provided:
"`(a) If the accused and his counsel and also the prosecuting attorney, in any prosecution for felony, whether capital or noncapital, consent thereto in open court, the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial, whether the jury has retired or not. A separation so permitted shall not create a presumption of prejudice to that accused, but on the contrary it shall be prima facie presumed that the accused was not prejudiced by reason of the separation of the jury.
"`(b) It shall be improper for the trial court to ask the accused, counsel for the accused or the prosecuting attorney, in the hearing of the jury, whether he or they will consent to a separation of the jury pending the trial.
"`(c) It shall be improper for the accused, counsel for the accused or the prosecuting attorney to state to the trial court in the hearing of the jury that he or they consent to a separation of the jury pending the trial.
"`(d) In the prosecution of any noncapital felony the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial."
"The appellant correctly asserts that jury separation is a procedural issue and that procedural rules promulgated by the Alabama Supreme Court generally govern over statutory provisions. Prince v. State, 623 So.2d 355 (Ala.Cr. App.1992); § 12-1-1, Ala.Code 1975. The appellant also correctly asserts that `when the Legislature gives the court the power to make rules and the court acts, the rules became of "legislative origin in substance."` Holsemback v. State, 443 So.2d 1371 (Ala.Cr.App.1983) (quoting Ex parte Leeth Nat'l. Bank, 251 Ala. 498, 38 So.2d 1 (1948)). However, § 6.11 of Amendment 328 to the Constitution of Alabama of 1901 provides as follows:
"`The supreme court shall make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts; provided, however, that such rules shall not abridge, enlarge or modify the substantive right of any party nor affect the jurisdiction of circuit and district courts or venue of actions therein; and provided, further, that the right of trial by jury as at common law and declared by section 11 of the Constitution of Alabama 1901 shall be preserved to the parties inviolate. These rules may be changed by a general act of statewide application."
"Thus, although the legislature gave the Alabama Supreme Court power to promulgate *912 rules governing court practice and procedure, it retains the authority to change those rules by a `general act of statewide application.'
"Rule 19.3, which in substance is a legislative act, covers the separation procedure for both capital and noncapital felony cases. We presume that, when enacting a statute, the legislature has full knowledge of and information about prior and existing law and legislation regarding a particular subject matter. State v. Thomas, 611 So.2d 472 (Ala.Cr.App.1992); Ex parte Love, 513 So.2d 24 (Ala.1987); Roberts v. State, 482 So.2d 1293 (Ala.Cr.App.1985). Therefore, we may presume that the legislature was aware of the provisions of Rule 19.3 when it enacted § 12-16-9. We also presume that the legislature does not enact meaningless, vain, or futile statutes. Langham v. State, 662 So.2d 1201 (Ala.Cr.App.1994); Sturgeon v. City of Vestavia Hills, 599 So.2d 92 (Ala.Cr.App.1992); Powers v. State, 591 So.2d 587 (Ala.Cr.App.1991). Because the provisions of the former § 12-16-9 are substantially similar to Rule 19.3, the legislature must have intended to change the existing law and depart from the prior law. Sheffield v. State, 708 So.2d 899 (Ala.Cr.App.1997). The 1995 revision of § 12-16-9 by the legislature eliminated the distinction formerly made between capital and noncapital felony trials. The statute now provides that a trial court may, in its discretion, allow the jury to separate in `any felony case.' Capital cases are felony cases. We presume the legislature knows the meaning of words it uses in enacting legislation. Ex parte Jackson, 614 So.2d 405 (Ala. 1993). If the legislature had intended for the statute to apply only to noncapital felonies, it knew how to make it do so. For example, it addressed noncapital felonies separately in the prior statute. Ex parte Jackson, 614 So.2d 405 (Ala.1993). However, in revising § 12-16-9, the legislature chose the word `felony' and did not distinguish between capital and noncapital felonies as it previously had. It used a general word rather than a specific one. We presume that the legislature meant to cover all felonies because if it had wanted to be specific, it knew how to do so just as it did in the past. We will not add what the legislature chose to omit. Ex parte Jackson, 614 So.2d 405 (Ala.1993). Therefore, we will not interpret § 12-16-9 to apply only to noncapital felonies as the appellant urges us to do."
Section 12-16-9, specifically authorized the trial court, ex mero motu, to order that the jury be separated. Woods's contention is without merit.

VIII.
Woods also argues that the trial court's failure to adequately instruct the jury, before each recess, not to read any newspaper accounts of the case or to listen to any television or radio news accounts, deprived him of his constitutional right to a fair and impartial trial. There was no objection at trial; thus, our review is limited to a plain error analysis. Rule 45A, Ala.R.App.P.
After the initial qualification of the venire, and immediately before the venire was excused for lunch, the trial court gave the following cautionary instruction:
"But let me tell you that when you leave, please do not talk to anyone about your jury service. Do not talk about this particular case. Do not try to gain any information about the case or anything else. Just go to lunch or do whatever and be back at one o'clock after you have finished filling out your questionnaire."
*913 At the end of the first day of testimony the trial court gave the following detailed cautionary instruction:
"When you go home tonight, you are reminded of the instructions I have already given you. When you leave this afternoon or come back tomorrow, do not talk with anyone who has anything to do with this case, any witness you have seen testify or any witness that you know of from the names that have been read or that you know may testify. You are not to talk amongst yourselves as you leave this afternoon or when you come back tomorrow morning about this case at all. You can talk about anything else, but not about the case. When you go home tonight, you cannot talk with any family members or friends about this case. If you by any chance pick up any sort of publication either this afternoon or tomorrow that has anything to do with this case, you are not to read that. If by any chanceand I don't think there is any broadcast media here, but should you tune in and hear any reports concerning this case, you are to turn off or walk out of the room or do whatever. Of course, any report you read or any report you hear will just be a summation of what you, yourself, have heard from the witness stand generally. Do not read or come into contact with any reports of this case. Finally, as I told you at lunch, several things have been testified to in this case that concern places around this courthouse that you may normally pass. Do not attempt to stop and do any investigation or research concerning any of the surrounding areas. Do not do any investigation or research concerning any possible law in this case. Do not attempt to talk to anyone or gain any information about this case. I'm sure all of you will follow these instructions. But as I told you yesterday, if for some reason between now and tomorrow morning, anything should come to your attention which violates these instructions, your duty would be to report that to me first thing tomorrow morning. You are in recess. Be back tomorrow at 9:00 a.m."
The trial court was not obliged to give this detailed instruction every time the jury took a break during the trial. Such a requirement would be unduly burdensome and unreasonable. It is clear from the record that the jury was more than aware that it was not to have any outside exposure concerning the case. No error, much less plain error, occurred here.

IX.
Woods further argues that the trial court erred in denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. Specifically, he contends that the State failed to present race-neutral reasons for striking two black prospective jurors from the venire.
The only basis for the Batson objection was the following: "We do allege they have exercised their strikes in a racially discriminatory manner, and as prima facie evidence, would show that out of 48 jurors, only two blacks remained, and both of those were struck. The defendant, Fred Woods, is a black male, 20 years of age." As we stated in Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___, ___ (Ala.Cr.App.1999):
"[T]he trial court could have lawfully found that no prima facie case of discrimination had been proven if Hall made no further argument on his Batson objection. However, because the trial court found that Hall had made a prima facie case of discrimination and allowed the State to provide its reasons for striking the black prospective jurors, *914 we will evaluate those reasons to determine if there was a Batson violation."
The trial court ruled that a prima facie case of discrimination had been established and required the State to cite its reasons for striking J.A. and B.L. The State presented the following evidence in support of its strikes of the two prospective black jurors.
"[Prosecutor]: The State, as to juror, [B.L.], the State exercised its peremptory strike against [B.L.] mainly because he said during voir dire that the assistant district attorney in this circuit, who assisted us in this jury selection process, Charlie Robinson, was opposite him in some civil litigation. The State had prior knowledge of that. In fact, Mr. Robinson handled a foreclosure against [B.L.] or [B.L.'s] home wherein Mr. Robinson represents Dr. Roy Shelton, who sold his home to [B.L.]. The second reason for striking [B.L.] that the state relied on is that [B.L.], during voir dire, stated under oath that he was familiar with a defense witness, who the defense has subpoenaed on behalf of the defendant in this case, a Mrs. Mattie Bell, and [B.L.] went on to say that not only did he know her, but she was a housekeeper for him at one time. Based on those two responses from [B.L.], the State struck him. As to [J.A.], the State, during voir dire asked the jurors of Panel No. 3, through Mr. Livingston, if they or a member of their family had ever been prosecuted by the State. [J.A.] did not respond to that question. At the end of voir dire, she was brought up before the Court in the privacy of the bench, and I asked her specifically if she knew or was related to two people who I had prosecuted, one being [W.A.], and one being [B.R.A.]. She acknowledged to the Court that both of these men, [W.A.], who the State has prosecuted on more than one occasion in the past was her brother-in-law; and also that [B.R.A.], who I personally prosecuted in 1989 on a drug distribution case, was also her brother-in-law. That is the reason the State excused [J.A.] from jury service."
The trial court then instructed defense counsel that the burden had shifted to him to rebut the facially valid reasons advanced by the prosecution. Defense counsel stated that B.L. had not indicated that he had a problem with the district attorney's office as a result of anything Mr. Robinson might have done. In regards to J.A., the defense stated that J.A. indicated that she did not even know one of her relatives had been prosecuted and that this fact would not affect her ability to be impartial. The trial court then noted that other members of the voir dire who had been on opposite sides of cases presented by members of the district attorney's office were also struck. The trial court then stated the following:
"The Court finds that the State consistently exercised its strikes in a manner that would justify B.L. being challenged by the Statenot challenged but peremptorily struck, and J.A. is also consistent with that in that she had two brothers-in-law that the State had been opposed to in various cases. The Court finds the challenge to the jury panel based on Batson and Branch v. State is overruled and denied."
As this Court has often stated, a trial court's ruling on a Batson motion should be given great deference on appeal and will be reversed only for an abuse of discretion. Brown v. State, 705 So.2d 871 (Ala.Cr.App.1997); Bishop v. State, 690 So.2d 498 (Ala.Cr.App.1995); Talley v. State, 687 So.2d 1261 (Ala.Cr.App.1996); Nance v. State, 598 So.2d 30 (Ala.Cr.App. 1992); Jackson v. State, 594 So.2d 1289 (Ala.Cr.App.1991); Mitchell v. State, 579 *915 So.2d 45 (Ala.Cr.App.1991), cert. denied, 596 So.2d 954 (Ala.1992). Great deference is given a trial court's ruling because the reasons advanced for striking prospective jurors are largely based on credibility determinations. Brown, supra. A trial court is in a far better position than a reviewing court to rule on issues of credibility.
On appeal, Woods argues that the State improperly struck B.L., without questioning him to determine if there was any bias on his part, because a member of the district attorney's office had been on the opposite side of a civil case against him. Woods fails to consider that the reason for a peremptory strike does not have to rise to the level of a challenge for cause to satisfy Batson. Dallas v. State, 711 So.2d 1101 (Ala.Cr.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998). To satisfy Batson it was not necessary for the prosecutor to question this juror to see if he was biased against the State.
In regard to the strike of J.A., Woods contends that there was no inquiry made of this juror to determine if she was close to her brothers-in-law who had been prosecuted by the district attorney. As stated above, the prosecutor was not obliged to question this prospective juror about her relationships with her brothers-in-law. The reason for a peremptory strike does not have to rise to the level of a strike for cause. Dallas.
Also, Woods asserts that a white prospective juror, who indicated that she had a relative who had been charged with a crime, was not struck. However, the record reflects that the white prospective juror indicated that her ex-brother-in-law had been charged with an offense.
There is no indication in the record of disparate treatment between the white and black prospective jurors. We see no reason to disturb the trial court's ruling.

X.
Woods also argues that the trial court erred, for a number of reasons, in allowing his confession to be received into evidence.
The standard used in determining whether confessions are voluntary was detailed by the Supreme Court in McLeod v. State, 718 So.2d 727, 729 (Ala.1998), on remand, 718 So.2d 731 (Ala.Cr.App.1998), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998):
"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App. 1984)....
"The Fifth Amendment to the Constitution of the United States provides in pertinent part: `No person ... shall be compelled in any criminal case to be a witness against himself....' Similarly, § 6 of the Alabama Constitution of 1901 provides that `in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.' These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).

*916 "It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879 the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967)."
(Footnote omitted; emphasis in original.) Also, the State has the burden of proving that a confession is voluntary by a "preponderance of the evidence." This standard is defined as:
"The greater weight of the evidence; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other."
Black's Law Dictionary 1201 (7th ed.1999).

A.
Initially, Woods contends that the admission into evidence of his confession was unlawful and violated his constitutional rights because, he says, he had invoked his right to remain silent. He also contends that the State failed to put on competent evidence that he had reinitiated contact with police, aside from the hearsay testimony of Deputy Thomas Earl Dixon, chief investigator for the St. Clair County Sheriff's Department.
Deputy Dixon and Investigator Joe Sweatt testified at the suppression hearing. Dixon stated that he and Sweatt talked with Woods on September 13, 1996, and that after Woods was read his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights he indicated that he did not wish to speak to them. It is undisputed that all questioning ceased at that time. Dixon further testified that the next day he received a call from a jailer at the jail where Woods was incarcerated. The jailer told him that Woods wanted to talk with him and Sweatt. Dixon said that Woods was again read his Miranda rights and that he signed a waiver of rights form indicating that he had been read his rights and that he understood them. Dixon stated that Woods initially checked the box on the waiver of rights form that indicated that he did not wish to make a statement. When the officers pointed this out to Woods, Woods told them that he had checked the wrong box. Woods then proceeded to check the box indicating that he did wish to make a statement, and he put his initials over the "no" box. Dixon further stated that no promises or threats were made to Woods in order to procure his confession and that Woods handwrote a three-page confession and signed it. He said that Woods did request that his mother be summoned to the police station and that he complied with this request. Woods also wrote out an explanation of how the proceeds of the robbery-murder were divided *917 between him and his codefendant, Richard Foreman.
The trial court, after hearing the officers' testimony, made the following findings:
"Based on the evidence presented, the Court finds that the statement of the defendant, which was written in the defendant's own handwriting, and signed by the defendant, was given voluntarily by the defendant. The Court further finds the statement given by the defendant was given with knowledge of his rights. The Court notes the following findings: Based upon all of the evidence presented at this hearing, the defendant appears to be quite literate and able to read, write, and understand certain terms. This is based on the fact he wrote out himself the statement. The Court further finds ... based upon Officer Sweatt's testimony and Officer Dixon's testimony, the Court finds the officers in preserving the original exercised a high degree of professionalism.... They could easily have torn up the form. If their purpose was to hide or cover up or do something dishonest, they could certainly have thrown away this form and done another. Instead the defendant's own initials appear over the check mark `no.' There was no attempt to hide that or disguise that. After checking `yes,' the defendant did write the statement. The Court finds that the officers acted in accordance with the dictates of the Constitution. The Court further notes, just offhand, if you look at the defendant's statements, there are numerous scratch-through with his initials. There are numerous markings that appear to be mistakes, and all of them are handled in the same manner. They are consistently scratched through, his initials are placed above them, and he continues on. Based on that, the Court holds the statementand this is the only statement I have, as well as the surrounding conversations, and forms are admissible...."
Woods argues that he had invoked his right to remain silent and that all questioning should have ceased; therefore, he says, his statement was unlawfully admitted into evidence. The United States Supreme Court in Miranda held that after an accused has been read his rights and indicates that he wishes to remain silent all questioning must cease. 384 U.S. at 473, 86 S.Ct. 1602. Courts have also recognized the difference in an accused's invocation of his right to counsel and an accused's invocation of his right to remain silent.
"However, the invocation of a defendant's right to silence may have a different impact on the permissibility of subsequent police conduct than the invocation of his right to counsel. Compare Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (additional questioning of suspect who had invoked Fifth Amendment privilege permissible when preceded by `fresh' Miranda warnings and a significant time lapse), with Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (interrogation of suspect who invokes right to counsel impermissible until suspect confers with counsel, unless he initiates subsequent contact with police). Consequently, the Supreme Court in Mosley, 423 U.S. at 101, n. 7, 96 S.Ct. at 325, n. 7, and this court in Kennedy v. Fairman, 618 F.2d 1242, 1248 n. 6 (7th Cir.), cert. dismissed, 449 U.S. 939, 101 S.Ct. 339, 66 L.Ed.2d 206 (1980), and White v. Finkbeiner, 611 F.2d 186, 193 n. 21 (7th Cir.1979), vacated and remanded, 451 U.S. 1013, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1981), have maintained a distinction between a suspect's *918 Miranda rights to counsel and to remain silent."
United States ex rel. Riley v. Franzen, 653 F.2d 1153, 1158 (7th Cir.1981).
We do not agree with Woods that the State must introduce proof that Woods reinitiated questioning with police. Here, Woods did not invoke his right to counsel. It is undisputed that Woods initially invoked his right to remain silent. As the United States Supreme Court stated in Michigan v. Mosley, 423 U.S. 96, 100-105, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975):
"`Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.' [Miranda v. Arizona,] 384 U.S., [436] at 473-74, 86 S.Ct., [1602] at 1627[,16 L.Ed.2d 694 (1966)].
"This passage states that `the interrogation must cease' when the person in custody indicates that `he wishes to remain silent.' It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that a person who has invoked his `right to silence' can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize `any statement taken after the person invokes his privilege' as `the product of compulsion' and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatsoever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.
"It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purpose of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.
"A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt `fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. *919 ...' 384 U.S. at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's `right to cut off questioning.' Id., at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'
"A review of the circumstances leading to Mosley's confession reveals that his `right to cut off questioning' was fully respected in this case. Before his initial interrogation, Mosley was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished. He orally acknowledged that he understood the Miranda warnings and then signed a printed notification-of-rights form. When Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position. After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete Miranda warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries. Detective Hill did not resume the interrogation about the White Tower Restaurant robbery or inquire about the Blue Goose Bar robbery, but instead focused exclusively on the Leroy Williams homicide, a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been arrested and interrogated by Detective Cowie. Although it is not clear from the record how much Detective Hill knew about the earlier interrogation, his questioning of Mosley about an unrelated homicide was quite consistent with a reasonable interpretation of Mosley's earlier refusal to answer any questions about the robberies.
"This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation."
Based on the United States Supreme Court's ruling in Mosley it was not necessary for the State to introduce evidence that Woods reinitiated contact with police once he invoked his right to remain silent. As quoted above, the inquiry focuses on whether the police "scrupulously honored" Woods's request to discontinue questioning. Here, the first interview with Woods resulted in Woods's refusing to make a statement. *920 It is undisputed that when Woods invoked his right to remain silent all questioning was ceased. The officers stated that they were called to the jail the next day. Woods was again read his Miranda rights and signed a waiver of rights form. Woods then proceeded to handwrite a three-page confession. He also wrote an explanation of how the proceeds of the robbery-murder were split between him and Foreman. Here, the dictates of Mosley were fully complied with. As we stated in Cleckler v. State, 570 So.2d 796, 803 (Ala.Cr.App.1990):
"Even though the appellant, in the present case, asserted his right to remain silent, the police were not forever barred from resuming their interrogation of him. See Mosley. This is true even where, as here, the police sought to reinterview the appellant about the same crime. See United States v. Bosby, 675 F.2d 1174, 1182-83 (11th Cir. 1982). All that is required is that the police `scrupulously honor' the accused's right to remain silent and wait a reasonable time before they attempt to reinterveiw him or her. Mosley (two hours held to be reasonable). See also Bosby, 675 F.2d at 1182, n. 12."

B.
Woods also argues that the hearsay testimony of Deputy Dixon, that a jailer had called him and told him that Woods wished to speak with him, should not have been allowed at the suppression hearing.[4] We do not agree.
The United States Supreme Court held in United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), that, "the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." 415 U.S. at 172-73, 94 S.Ct. 988. See Quinn v. State, 611 So.2d 483 (Ala.Cr.App. 1992). The issue presented in Quinn was the same as that presented in the instant casewhether hearsay evidence was admissible at a suppression hearing. The Quinn court, following the rationale of the United States Supreme Court in Matlock, noted that the reason the strict rules of evidence do not apply in suppression hearings is that in a suppression hearing, "the judge is the finder of fact" not the jury. The Quinn court, quoting Matlock, also stated:
"`In Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), it was objected that hearsay had been used at the hearing on a challenge to the admissibility of evidence seized when a car was searched and that other evidence used at the hearing was held inadmissible at the trial itself. The Court sustained the trial court's rulings. It distinguished between the rules applicable to proceedings to determine probable cause for arrest and search and those governing the criminal trial itself "There is a large difference between the tribunals which determine them, and therefore a like difference in the *921 quanta and modes of proof required to establish them." Id., at 173 [69 S.Ct. at 1309]. That certain evidence was admitted in preliminary proceedings but excluded at the trialand mere to "illustrates the difference in standards and latitude allowed in passing upon the distinct issues of probable cause and guilt." Id., at 174 [69 S.Ct. at 1310].'
"415 U.S. at 173, 94 S.Ct. at 994. See Nation v. State, 579 So.2d 690 (Ala.Cr. App.1990); Tierce v. State, 396 So.2d 1090 (Ala.Cr.App.1981)."
611 So.2d at 485.

C.
Woods next argues that his confession should not have been received into evidence because, he says, it was the fruit of the poisonous tree. He contends that there was no probable cause to arrest him and, thus, that anything discovered as a result of the unlawful arrest should have been suppressed. The validity of Woods's arrest was never questioned at trial.
"[T]he appellant argues that the state failed to show that his arrest was the result of a valid arrest warrant and that, therefore, the trial court erred in denying his motion to suppress statements made after his arrest.
"... Neither the warrant nor any evidence of the factual basis for its issuance is contained in the record because the appellant did not question his arrest before he raised the issue on appeal. The appellant, in this instance, had the burden of proving that the arrest was not the result of a valid warrant. See McMillian v. State, 594 So.2d 1253 (Ala. Cr.App.1991) (A defendant seeking to suppress evidence seized at time of arrest has burden of showing that arrest was not based on probable cause). See also 4 W. LaFave, Search & Seizure § 11.2(b) (2d ed.1989). The appellant offered no evidence that the warrant was deficient in any way."
Hutcherson v. State, 677 So.2d 1174, 1183 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.), on remand, 677 So.2d 1210 (Ala.Cr.App.1996), after remand, 727 So.2d 846 (Ala.Cr.App.1997), aff'd, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). Because the legality of Woods's arrest was never questioned, we have no record of the circumstances surrounding his arrest. The facts we can glean from the record are that Louis Jones gave a statement to police and led them to a .38 caliber gun that he kept in his car. Jones testified that he loaned Woods and Foreman his car on the night of the robbery-murder and that when they returned he asked Woods if he had shot someone and he said that he had. The evidence in the record tends to show that there was probable cause for Woods's arrest.

XI.
Woods next argues that the trial court erred in allowing a photograph of the victim, when he was still alive, to be received into evidence. He contends that its admission was irrelevant and prejudicial. We do not agree.
In Harris v. State, 632 So.2d 503 (Ala. Cr.App.1992), aff'd, 632 So.2d 543 (Ala. 1993), cert. denied in part, 512 U.S. 1234, 114 S.Ct. 2736, 129 L.Ed.2d 858 (1994), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), we addressed this issue and stated:
"The appellant further argues that the State introduced photographs of the victim, while he was still alive, in order to obtain a verdict and sentence based on passion and prejudice in violation of her rights to a fair trial and sentencing. She argues that the photographs of the victim while he was alive were irrelevant *922 to any issue before the jury and introduced solely to inflame the jury. The single picture of the victim, prior to his murder, was relevant as it tended to identify the victim, especially in light of the condition of the victim's face after having been shot. As such, the introduction of this photograph during the guilt phase was not an Eight Amendment violation. See Willis v. Kemp, 838 F.2d 1510, 1521 (11th Cir.1988), cert. denied, 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989)."
Likewise in this case Smith was shot in the head. The picture of the victim before his murder was relevant because "it tended to identify the victim."
Woods further argues that the trial court erred in receiving into evidence photographs of the victim's dead body and the crime scene, because, he says, the photographs were prejudicial, gruesome, and cumulative. In Travis v. State, 776 So.2d 819, 869 (Ala.Cr.App.1997) we stated:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr. App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala. Cr.App.1984)."
"Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)."
The trial court committed no error in receiving the photographs into evidence.

XII.
Woods next argues that the trial court erred in admitting into evidence gloves purchased before the robbery-murder and allegedly worn by Woods and Foreman during the murder. He contends that there was no evidence that he was again read his Miranda rights before he led police to the location of the gloves.
As the State contends in brief, Officer Sweatt testified that Woods led him to the location of the gloves on September 14, 1996, the day he confessed to the robbery-murder. There is no evidence that there was a significant break because of an intervening event or the passage of time that would necessitate the rereading of Woods's Miranda rights.
"`There is no requirement that a suspect be informed of his constitutional rights before each interrogation in a series of interrogations. C. Gamble, McElroy's Alabama Evidence § 201.09 (4th *923 ed. 1991). A determination of whether Miranda warnings must be repeated should be made on a case-by-case basis. Magwood [v. State, 494 So.2d 124 (Ala. Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986) ]; Tolbert v. State, 450 So.2d 805 (Ala.Cr.App. 1984).' Holliday v. State, 641 So.2d 325, 327 (Ala.Cr.App.1994) (wherein a statement taken a little more than three hours after a statement for which the defendant had been advised of an waived his rights was properly admitted into evidence, although the defendant had not been advised of his rights again.) See Johnson v. State, 584 So.2d 881 (Ala.Cr.App.1991) (wherein a statement taken six hours following a statement for which the defendant had been advised of his rights was properly admitted, although no renewed Miranda warnings had been given.)"
Johnson v. State, 648 So.2d 629, 637 (Ala. Cr.App.1994).
Also, when Woods confessed, he told police exactly where he had disposed of the gloves. A police investigation would have inevitably discovered the gloves without Woods's leading police to their location. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Therefore, there was no error in the admission of the gloves.

XIII.
Woods further argues that it was error to allow the victim's wife to testify about her relationship with the victim. He contends that this was inadmissible victim-impact evidence that should not have been presented during the guilt phase of the capital trial.
In Smith v. State, 756 So.2d 892 (Ala.Cr. App.1997), this Court addressed a similar issue:
"In Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court held as follows:
"`We agree with Rieber that Mr. Craig's testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala. 1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Cr.App.1990) ]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App. 1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to *924 Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected that Ms. Craig was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).'
"663 So.2d at 1005-06 (emphasis supplied [in Smith])."
(Emphasis in original). No error occurred here.
Likewise, in this case there was no objection to the testimony about the length of the victim's marriage and the fact that he had been a chiropractor in Ashville for over 35 years. Other questions were addressed to the victim's wife that related to the convenience store and the items that were stolen from the store. Very little evidence was presented that did not directly relate to the convenience store. Also, no cross-examination was addressed to the witness on the questioned evidence. We are confident, as was the Smith court, that this evidence, unrelated to Woods's guilt, did not deny Woods a fair and impartial trial.

XIV.
Woods further argues that the trial court erred in allowing a piece of a green towel to be received into evidence because, he says, it was irrelevant and prejudicial. Investigator Randy Wall with the St. Clair County Sheriff's Department testified that Foreman led him to a secluded wooded area in Ashville where, he said, Woods and Foreman threw a .38 caliber spent shell casing. Wall testified that he attempted to find the shell casing but was unsuccessful; he did, however, find a piece of a green towel in the same area. Evidence was presented that the gun used in the murder had no fingerprints or blood on the exterior of the gun but that there was blood inside the barrel of the gun. It was the State's contention that Woods used the towel to wipe the gun cleanexplaining why there were no fingerprints or blood on the exterior of the gun.
Initially, we note that the only objection to the admission of the towel was that a proper chain of custody had not been established *925 for its admission. Woods did not argue that the towel was irrelevant or prejudicial; thus, our review of these contentions is for plain error. Rule 45A, Ala. R.App.P.
Alabama follows a liberal test for determining whether an item of evidence is relevant and thus admissible. "`Under the liberal test of admissibility in Alabama, "a fact is admissible if it has any probative value, however slight, upon a matter in the case.' [C. Gamble, McElroy's Alabama Evidence, § 21.01 at 34 (4th ed. 1991).]" Ex parte Scott, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999). "The pertinent rule is that articles or objects which relate to or tend to elucidate or explain the issues or form a part of the transaction are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the occurrence." Liberty National Life Insurance Co. v. Weldon, 267 Ala. 171, 100 So.2d 696, 712 (1957).
There was no plain error in the trial court's receipt of the towel into evidence. The State's description of the towel's use presented a reasonable explanation as to why the exterior of the gun was clean.

XV.
Woods also argues that numerous instances of prosecutorial misconduct denied him a fair and impartial trial. The standard of review we use to evaluate whether a prosecutor's comments are erroneous and amount to reversible error was discussed by this Court in Maples v. State, 758 So.2d 1, 53 (Ala.Cr.App.1999).
"In judging a prosecutor's closing argument, the standard is whether the argument `"so infected the trial with unfairness as to make the resulting conviction a denial of due process."` Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
"`In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).'
"Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Cr.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993). Finally,
"`"[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr. App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). "In evaluating allegedly *926 prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits," Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). "In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). "To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted." Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App. 1985) (citations omitted).'
"Coral v. State, 628 So.2d 954, 985 (Ala. Cr.App.), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994)."
See also Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999).

A.
Woods first argues that the prosecutor distracted the jury's attention from the issue of guilt by commenting in his guilt-phase opening argument that a capital trial in Alabama is a "multi-phase trial." He asserts that this comment was a comment on sentencing and was inappropriate in the guilt phase of a capital trial.
The following occurred:
"That is what we are going to set out to prove to you this week. This is the guilt phase of a capital trial. A capital murder trial is somewhat different from other cases under Alabama Law in that it is a multi-phase trial
"Mr. Vandall [defense counsel]: We object. There has been no establishment of that phase at this juncture in this case and it is prejudicial. We move to strike.
"The Court: At this part of the trial, you are only to be concerned with the guilt or innocence of the defendant. That is the matter you are directed to. I'll sustain the objection."
Here, there is no adverse ruling from which to appeal. Defense counsel objected and the trial court immediately instructed the jury that matters of sentencing were not to be considered at that time.
"Initially, we observe that the appellant has no adverse ruling from which to appeal. In each instance the trial court instructed the jury to disregard the complained of arguments.... As we have previously stated, "The trial court's immediate curative instruction concerning the prosecution's comment creates a prima facie presumption against error. Holliday v. State, 641 So.2d 325, 329 (Ala.Cr.App.1994); Mathis v. State, 414 So.2d 151 (Ala.Cr.App.1982)."
"Smith v. State, 756 So.2d 892, 928 (Ala. Cr.App.1998), aff'd, 756 So.2d 957 (Ala. 1999)."
Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___, ___ (Ala.Cr.App. 1999). Moreover, it is not reversible error for a prosecutor to comment on Alabama's statutory procedure for trying a capital murder case. See Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).

*927 "The appellant contends that the prosecutor and the trial court violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by informing the jury that a conviction for capital murder would carry a punishment of either life imprisonment without parole or death, and that the jury would be required to determine the appropriate sentence. Immediately following the administering of the oath to the venire, the trial court informed the venire-members that if the appellant was found guilty of capital murder, `then it [would] be the job of the jury to determine whether the appropriate punishment in the case is life in prison without parole or death by electrocution.' Immediately after the jury was sworn, the prosecutor, in his opening statement, informed the jurors that a conviction for capital murder `would carry a punishment of either life in the penitentiary without parole or death by electrocution.' The appellant argues that it is inappropriate for a jury to be considering punishment issues during guilt-phase deliberations, and that such a practice `relieves the state of its burden of proving every element of the offenses beyond a reasonable doubt.' Again, no objection was made in the trial court to these comments; therefore, we review this issue under the plain error rule.
"Caldwell v. Mississippi held that it is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere. In the instant case, the comments of the trial court and the prosecutor were intended to inform the veniremembers and the jurors of the nature of the case about to be tried and the general procedures that would be followed. It is not error for the trial court to instruct the jury as to its role in the sentencing process. See e.g., Ex parte Hays, 518 So.2d 768 (Ala. 1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Martin v. State, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The comments did not diminish or detract from the jury's role and responsibility in the proceedings. The jurors could not have reasonably interpreted the comments to mean that the state was relieved of its burden to prove every element of the offenses charged beyond a reasonable doubt, as the appellant contends. We find no error in the proceedings in reference to the comments referred to above, and certainly no plain error."
Williams, 710 So.2d at 1325.

B.
Woods next argues that the prosecutor misstated the law by, he alleges, stating that the evidence of intoxication should be ignored. The following occurred during the guilt-phase closing argument:
"That is bad evidenceblood in the barrel of a gun. It should make you sick. It is good evidence. If you can't hang your hat on that, because I don't know what the proffer is here. Let's say they are too high. Who cares? Who cares whether somebody is so high? The judge will give you a charge and that is the law. You should consider it. We don't need to care really. Everybody uses their common sense and
"Mr. Vandall [defense counsel]: Judge, I object. He is instructing the Jury to disregard the Court's charge.

*928 "The Court: Ladies and Gentlemen of the jury, it is my job to instruct you as to the law in the case. The attorneys may refer to the law, but you are to follow the law as I charge you."
The trial court instructed the jury to disregard counsel's comment. As stated above, there is a prima facie presumption that no error occurs when a jury is immediately instructed to disregard a comment of counsel. See Hall, supra.

C.
Next, Woods argues that the prosecutor erred by making the following comment:
"That is really what it boils down to. There is no other reasonable conclusion. The State doesn't want a conclusion. We want a verdict of justice. That is somebody that says they killed someone for money with a gun and a car 15 or 20 minutes after planning a premeditated cold-blooded killing. There ain't nothing here that tells you nothing different. They need to sit and take the responsibility that this jury can place on their shoulder. That is by a verdict of guilty as to capital murder. This is a murder during the course of a robbery. It is plain and simple. It is serious. No one here is saying it is not serious. We ask you for that verdict. Thank you."
There was no objection to the prosecutor's comment; thus, our review is limited to determining whether plain error occurred. Rule 45A, Ala.R.App.P. "`"This court has concluded that the failure to object to improper prosecutorial arguments... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."'" Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting in turn Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, Johnson v. Dugger, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).
Woods argues that the above comment admonished the jury to do its duty and that its duty was to return a guilty verdict. He contends that this argument was the type of argument condemned by the United States Supreme Court in United Sates v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). See also Arthur v. State, 575 So.2d 1165 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991). We do not agree.
Here, the prosecutor did not admonish the jury to find Woods guilty because it was its duty. It is clear from reviewing the entire closing argument that the prosecutor was commenting on the evidence and urging the jury that it should find Woods guilty based on the evidence. There is no plain error here.

XVI.
Woods next argues that the trial court erred in denying his motion for a judgment of acquittal because there was no evidence that he had the specific intent to kill Smith. He contends that the uncontroverted evidence showed that he was too intoxicated to form the intent to kill Smith. In Davis v. State, 740 So.2d 1115 (Ala.Cr. App.1998), this Court held that the issue whether intoxication is so great as to negate intent is a jury question. This Court stated:
"The appellant also contends that he was too intoxicated to form the specific intent to murder the victims.
"`The question whether a defendant's intoxication rendered it impossible *929 for the defendant to form a particular mental state is also a question for the jury. See Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991). Evidence of intoxication, whether voluntary or involuntary, is admissible when it is relevant to negate an element of the offense charged. § 13A-3-2(a). "Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent." Lovett v. State, 491 So.2d 1034, 1039 (Ala.Cr.App.), cert. denied, 491 So.2d 1039 (Ala.1986) (quoting State v. Massey, 20 Ala.App. 56, 58, 100 So. 625, 627 (1924)). The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. Ex parte Bankhead, 585 So.2d at 121. The law concerning intoxication resulting from drug use is the same as intoxication resulting from alcohol. Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987).'
"Williams v. State, 710 So.2d 1276, 1338 (Ala.Cr.App.1996). To negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.
"`"In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App. 1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App. 1983) ]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. ...'
"`Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991)."
"Smith v. State, 646 So.2d 704, 712-13 (Ala.Cr.App.1994)(emphasis added).
"The trial court properly allowed the jury to determine the effect of the appellant's alleged intoxication on his ability to form a specific intent. His "`conduct and demeanor immediately after the crime provided a reasonable inference of sanity.'" Smith, 646 So.2d at 713 (quoting Cunningham v. State, 426 So.2d 484, 491 (Ala.Cr.App.1982)). The appellant's attempt to hide the crime by burning the house, the fact that he appeared to Dodd to be `scared to death' even though he appeared to be `drunk and on drugs,' his statement to Dodd about the guns being from `far away,' and his attempt to hide the shotgun from the police when he was arrested all indicate that he was not so intoxicated at the time of the offense that he was unable to appreciate the criminality of his conduct. The evidence he offered in support of his intoxication defense was contradicted by evidence offered by the State. By finding the appellant guilty of the offense charged, the jury obviously concluded that he had not proved his intoxication defense, and we see no reason to disturb this conclusion."
Davis, 740 So.2d at 1120-21.
The evidence, as recited in the beginning of the opinion, reflects that the trial court *930 did not err in denying the motion for a judgment of acquittal. There was evidence presented that Woods and Foreman planned the robbery-murder, that Woods was coherent enough during the robbery-murder to detail the events in his confession, and that Woods even was about to tell the police the location of the gloves that he had disposed of. There was sufficient evidence for the jury to conclude that Woods did intend to kill Smith.

XVII.
Woods also argues that the trial court committed many errors in its oral charge to the jury.

A.
Initially, Woods argues that the trial court erred in refusing to instruct the jury on the lesser offenses of felony murder, murder, and robbery. Here, the trial court instructed the jury on robbery-murder and on manslaughter based on intoxication.
We have stated, "Even in a capital case a defendant is not entitled to instructions on a lesser included offense unless there is a rational theory from the evidence presented supporting such an instruction. Roberts v. State, 735 So.2d 1244 (Ala.Cr.App.1997)." Hall, ___ So.2d at ___. "A charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge. Beck v. State, 396 So.2d 645 (Ala. 1980)." Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App.1982). Also, a trial judge court has great discretion in formulating its jury charge. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).
"A felony murder is committed when a person commits or attempts to commit one of several enumerated felonies, and, in the course of or in furtherance of the crime or in flight from the crime, that person causes another person's death. There is an intended felony and an unintended homicide. Ex parte Bates, 461 So.2d 5 (Ala.1984); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993); C. Torcia, Wharton's Criminal Law, § 147 (15th ed. 1994)."
Knotts v. State, 686 So.2d 431, 457 (Ala.Cr. App.), after remand, 686 So.2d 484 (Ala.Cr. App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559 (1997).
This is not a situation where Woods entered the store without a weapon. The evidence clearly showed that Woods obtained a weapon before he entered the store. In his confession Woods stated that he aimed the gun at Smith and closed his eyes. Clearly these actions do not reflect that the murder was unintended. Here, either Woods was too intoxicated to form the intent, as he argued at trial, lowering the crime to manslaughter, or he intended to pull the trigger, and thus, he was guilty of capital murder. In either situation, there was no evidence that the murder would fall within the felony-murder doctrine.
Woods also argues that the trial court erred in failing to instruct the jury on murder and on robbery. There was no objection to the trial court's failure to charge on robbery; thus, our review as to this issue is limited to determining whether plain error exists. Rule 45A, Ala. R.App.P. As this Court stated in Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995):
"In the present case, the trial court did not charge the jury as to intentional murder as a lesser included offense, because the evidence presented did not support a rational basis for a conviction of intentional murder. The State's evidence *931 indicated that the appellant intended to rob the victim when he accompanied him to his home. He then engaged in a struggle with the victim in order to rob him, and using a knife that he had brought to the scene, the appellant murdered the victim and escaped with some of his property. The appellant's theory of the case, as established by his trial testimony, was that he did not intend to kill the victim, but rather that he acted in self-defense against the victim's assaults. There is no theory which does not include a robbery in connection with the death; therefore, if there was an intentional murder, then the offense was capital murder during a robbery."
Here, there is no theory that the murder did not occur in connection with the robbery. The same is true of the trial court's failure to instruct on the lesser offense of robbery. There was no evidence that the robbery did not occur in connection with the murder. The trial court committed no error in failing to instruct the jury on the lesser separate offenses of robbery and murder.

B.
Woods also argues that the trial court erred in failing to instruct the jury that it alone could make a finding as to whether Woods's confession was voluntary. Our review is limited to the application of plain error because this issue was never presented to the trial court. Rule 45A, Ala.R.App.P.
This same issue was recently addressed in Minor v. State, 780 So.2d 707 (Ala.Cr. App.1999), and was decided adversely to Woods.
"In Ex parte Trawick, [698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568 (1997) ], the Alabama Supreme Court, addressing a similar issue, stated:
"`Trawick next argues that the trial court erred to reversal by failing to instruct that the jury, and not the trial court, was to make the ultimate decision regarding the voluntariness of Trawick's confession. After a pre-trial hearing on the voluntariness of the confession, the trial court ruled that it was admissible, and the confession then became central to the State's case against Trawick. Trawick contends that, by allowing the confession into evidence over his objection, the trial court implied to the jury that the confession was voluntary and proper. Trawick concludes that the trial court was required to instruct the jury that there was still an issue of fact as to the voluntariness of the confession, and he contends that its failure to do so was reversible error.
"`This Court has recognized that a trial court cannot lawfully prevent a jury from making a determination of voluntariness as affecting the weight and credibility to be given a defendant's statements. Ex parte Singleton, 465 So.2d 443 (Ala.1985). In Singleton, the trial judge specifically told the jury that he had already determined that the defendant's statement was voluntary and therefore admissible; however, the judge also clearly instructed that it was the jury that was to ultimately determine whether the confession was voluntary. This Court ruled that these comments did not imply that the jury should accept or believe the defendant's confession merely because it had been ruled admissible.
"`In this case, there is even less to indicate that the trial court in any way implied to the jury that Trawick's confession was voluntary merely because it was admissible. In admitting Trawick's *932 confession into evidence, the trial court did not tell the jury that it had previously ruled upon the voluntariness of Trawick's confession. The trial court properly instructed the jury that the court would rule only as to whether evidence could be admitted into the case and that the jury would be the sole and exclusive judge of the truth of the evidence that was admitted. The trial court specifically stated that it did not get involved in the jury's `job' as the finder of fact. We find no plain error in the trial court's instruction."
"Ex parte Trawick, 698 So.2d at 174.
"Likewise, the trial court in the present case admitted Minor's statements without instructing the jury that it had made a preliminary determination on the voluntariness of the statements or that the jury was to consider the voluntariness of the statements as a factor going to the weight of the evidence. Unlike in Bush v. State, supra, the trial court did not inform the jury that it had made a preliminary determination on the admissibility of Minor's statements; therefore, the trial court never created any inference concerning the weight or credibility of Minor's statements. Consequently, we reject Minor's contention that by not instructing the jury on voluntariness, the trial court eliminated some of the jury's responsibilities."
Here, as in Minor and Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), the trial court never instructed the jury that it had made a preliminary determination that the confession was voluntary. Also, on several occasions the trial court instructed the jury that it was the sole judge of the credibility of the evidence presented in the case. No plain error occurred here.

C.
Woods next argues that the trial court's jury instructions on capital murder were flawed because it failed to instruct the jury that the intent to rob could not be a mere afterthought to the murder. Our review is limited to a plain-error analysis because there was no objection at trial. Rule 45A, Ala.R.App.P. The trial court gave the following instruction:
"The intent must be real and specific in order to invoke the capital offense in this case. That intentional murder must have happened, in order for the State to prove the elements alleged in the indictment, must have happened during a robbery in the first degree. We have the intentional murder defined for you. Now, what does during mean? During means in the course of, or in connection with, or in immediate flight from the commission ofin this case, it is the commission of robbery in the first degree. The word `during' necessarily implies some mental connection or some connection of purpose in the defendant's mind, and the intent to rob and the intent to kill would have to co-exist in the defendant's mind in order for the capital offense to occur.
"So, we have intentional murder defined and that intentional murder had to occur during something. In this case, the State alleges that it happened during a robbery in the first degree. As you might have guessed, that is the next step."
Although this court has held that the taking of property as a mere afterthought to a murder will not support a capital murder conviction under § 13A-5-40(a)(2), Bufford v. State, 382 So.2d 1162 (Ala.Cr. App.), cert. denied, 382 So.2d 1175 (Ala. 1980), we have not held that the trial court must use the term "mere afterthought" in *933 its jury instructions on robbery-murder. The trial court more than adequately instructed the jury that the robbery had to occur "during" the course of the murder. The trial court's instructions were not erroneous on this ground.

D.
Woods further argues that the trial court's instructions on circumstantial evidence were flawed. Specifically, he contends that the trial court erred in using the phrase, "consistent with the innocence of the defendant" in its circumstantial evidence instruction. The court's instruction on circumstantial evidence read in part:
"The defendant in this case comes to you and is presumed to be innocent, as you have been told several times. Now when part or all of the evidence that is relied on by the prosecution in the case is circumstantial, the chain of circumstances must be so complete and of such a character so as to convince you beyond a reasonable doubt of the defendant's guilt. The evidence must be so strong and cogent, and unless it is so strong and cogent as to show the defendant's guilt beyond a reasonable doubt, then you should not find the defendant guilty. A conviction may be had upon evidence which is circumstantial so long as the evidence is so strong and cogent as to prove the defendant's guilt beyond a reasonable doubt. Now a conviction may not be had upon circumstantial evidence if there is any inference based on that evidence that is consistent with the innocence of the defendant in this case. Basically, what I have just told you is that in relying on circumstantial evidence, that evidence must convince you beyond a reasonable doubt of the guilt of the defendant. The burden is on the State to prove that. There is one other piece of evidence that you are going to take back in the courtroom with you that did not come to you from the witness stand. That evidence is the presumption of innocence of the defendant."
(Emphasis added.) Woods challenges the highlighted portion of the above charge.
The circumstantial-evidence instruction given by the trial court is substantially similar to the instruction in the Alabama Pattern Jury Instructions: Criminal on this concept. Also, the Supreme Court has stated, "`Circumstantial evidence is sufficient when it is so strong and cogent as to indicate the guilt of the defendant to a moral certainty. That evidence should also exclude any inference consistent with the defendant's innocence.'" Ex parte Mitchell, 723 So.2d 14 (Ala.1998), quoting Ex parte Davis, 548 So.2d 1041, 1044 (Ala. 1989). The court's instruction was a correct definition of circumstantial evidence and its sufficiency to support a conviction.

E.
The appellant next argues that the trial court's instructions on reasonable doubt were flawed because, he says, they implied that the jury could convict if it was "reasonably satisfied" that the state had proven all of the elements of the offense. Woods complains of the court's use of the phrase "reasonably satisfied" in one instance in its 35-page charge to the jury. We must review the challenged portions not in isolation but in relation to the jury instructions as a whole. Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992). A review of the entire instructions clearly reflects that the trial court thoroughly instructed the jury that the proof necessary to convict had to be proof beyond a "reasonable doubt."
Woods also contends that the trial court's jury instructions on reasonable doubt were flawed and that the violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. *934 328, 112 L.Ed.2d 339 (1990), because the instructions lessened the State's burden of proof by stating that the jurors must have an "abiding conviction as to the truth of the charge to convict." This Court in Minor v. State, 780 So.2d 707, 782 (Ala.Cr. App.1999), stated, "the United States Supreme Court held in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), that an instruction on reasonable doubt phrased in terms of an `abiding conviction' correctly stated the state's burden of proof" and did not constitute error.

F.
Woods further argues that the trial court's jury instructions on intoxication were flawed because the trial court instructed the jury that evidence of intoxication must amount to insanity before it could negate the element of intent.
It is the law in Alabama that before intoxication can negate intent as an element of murder it must amount to insanity. We have approved similar instructions. See Minor, supra; Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Wesson v. State, 644 So.2d 1302 (Ala.Cr.App.1994).

Penalty Phase

XVIII.
Woods argues that the trial court intruded into his defense and thereby denied him his constitutional right to the assistance of counsel when it interfered in the presentation of his case. He cites several instances in support of this contention. We note that this issue was never presented to the trial court and must be reviewed under a plain-error analysis. Rule 45A, Ala.R.App.P.
This Court in Gwin v. State, 425 So.2d 500, 507 (Ala.Cr.App.1982), writ quashed, 425 So.2d 510 (Ala.1983), quoting Dennison v. State, 17 Ala.App. 674, 676, 88 So. 211 (1921), commented on the role of a judge:
"`The trial judge, as a natural consequence of his position and the many duties devolving upon him, is necessarily vested with much discretion in the conduct of the trial of cases, and, unless it clearly appears that there has been an abuse of this discretion, appellate courts will not interfere to control such discretion, but will presume that one occupying so important a position as that of circuit judge will accord to all litigants in his court the fair and impartial trial provided for in the Constitution of this State. That a trial judge wields a great influence upon the jury cannot be questioned, for it is their duty to follow his instructions as to the law. So, whenever he expresses an opinion on any disputed fact, or of the character of a witness, or compliments one attorney at the expense of another, or uses language which tends to bring an attorney into contempt before the jury, or uses any language or makes any intimation which tends to prejudice them, he commits an error of law, which would, of necessity, effect a reversal of the judgment and a remandment of the cause.'
"Dennison, 17 Ala.App. at 676, 88 So. 211."
In Glover v. State, 393 So.2d 510, 512 (Ala.Cr.App.1981), the appellant claimed that he was denied a fair trial because, he alleged, the trial court took an active part in the prosecution by "`suggesting ways the district attorney could prove his case.'" This Court after evaluating the record stated,
"It is clear from the foregoing portions of the record that the trial judge *935 was nothing but impartial. His remarks were aimed at preventing further inadmissible testimony from going before the jury. We believe that his conduct was that of an experienced trial judge who recognized that illegal evidence could prejudice the appellant if the court did not act promptly. Clearly, the trial judge was acting in the interest of the appellant, and his conduct of the proceedings was not error."
Glover, 393 So.2d at 513. We have also stated that when the complained-of conduct occurs outside the presence of the jury there are no grounds for reversal. Oglen v. State, 440 So.2d 1172 (Ala.Cr.App. 1983), cert. denied, 440 So.2d 1177 (Ala. 1983). With these holdings in mind we review the issues raised by the appellant.
We note that all of the complained-of instances occurred outside the presence of the jury. Initially, Woods argues that the trial court interfered in his defense by requesting that his attorney name the witnesses he was subpoenaing for trial. It is clear from a review of the record that the trial court was attempting to determine the witnesses that were called in the penalty phase. Clearly, the trial court was aware of the problems that may occur when absolutely no evidence is presented in mitigation in the penalty phase of a capital trial. See Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.), after remand, 689 So.2d 948 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997). Also, the trial judge issued an order that stated that the names of the witnesses were not to be filed in the circuit court clerk's office but to be filed with him directly. We do not believe that any interference prejudicial to Woods occurred here.
Woods also cites one instance during voir dire when the trial court spoke to Woods and asked him to consult his attorneys about the decision not to strike for cause a particular juror who had indicated that she was related to someone in the district attorney's office. Clearly, in this colloquy the trial court advised Woods to speak with his attorney. No interference with the attorney-client relationship occurred here.
Woods further argues that the trial court intruded into his defense and his relationship with his attorney when he questioned the fact that only four witnesses were scheduled to testify at the penalty phase of the trial. The following occurred:
"The Court: Let the record reflect the following takes place outside the presence of the jury. The Court has been informed by the attorneys for the defendant that the defendant will not take the stand in this sentencing phase. Mr. Woods, do you understand you have a right to testify and talk to the jury and furnish to them any reason or evidence of any reason that you may think for them to recommend a sentence of life without parole? Do you understand you have that right?
"Defendant: Yes.
"The Court: It is my understanding you are not going to testify at this stage of the proceedings?
"Defendant: Right.
"The Court: Is that a decision that you made?
"Defendant: Yes.
"The Court: I cannot force you to testify. I just want to make sure that is your decision and one that you made and that you understand you have a right to testify.
"Defendant: I do.

*936 "The Court: Another matter. Early on, I was submitted a list of possible witnesses in this cause. You have called four. If you could give me some general reason why no other witnesses are being called at this time.
"Mr. Rushing [defense counsel]: The investigators that we have hired in this case have indicated prior criminal conduct on behalf of the lion's share of the witnesses that were on the list. Additionally, our investigators have not been successful in serving all the subpoenas that were issued in this case for the penalty phase. Those two facts have really limited us to the four that we presented.
"The Court: Mr. Woods, have your attorneys explained to you that many of the witnesses who you indicated may be able to help you at this phase are not being called because they may have some prior criminal record or prior criminal convictions?
"Mr. Vandall [defense counsel]: Judge, he understands that.
"The Court: I understand it from you. I want to understand it from Mr. Woods. That was the reason they are not putting some of them on the stand.
"Defendant: Yes.
"The Court: Was there anyone out of that potential list that you wanted to testify at this point who has not testified?
"Defendant: I don't know.
"The Court: Is there anyone here that has not testified that you want to testify on your behalf?
"Defendant: Aunt Pearlie Woods is back there.
"The Court: Any particular reason she is not being called?
"Mr. Rushing [defense counsel]: After reviewing the witnesses that were present here this afternoon, and going over them with the defendant, we presented the four witnesses that have testified and he indicated he was satisfied with that and at that time, did not wish to call anyone else. Certainly, if he wishes to have another witness take the stand, we will do that.
"The Court: Y'all need to talk to him right now and make sure about these witnesses.
"(A short break was had and the defense attorneys consulted with the defendant, and afterwards, the following proceedings were had and done with the jury not being present, but with the defendant being present with his attorneys:) "Mr. Rushing: After further conversation with the defendant as to what witnesses he wishes to call at the penalty-phase hearing, it has been indicated that he wants to call Diedra Woods, Tamea Richardson, Pearlie Woods, and Wydesta Woods. After speaking with all the witnesses, Wydesta Woods indicated she was not emotionally able to take the stand at this time, as did Diedra Woods, and Tamea Richardson. We have one other witness we will call at this time, and that is Pearlie Woods."
After this discussion Pearlie Woods was called to testify. She testified that she did not believe Woods was capable of killing, that the crime was not consistent with his character, and that he did not deserve to be electrocuted.
Woods relies on Blanco v. Dugger, 691 F.Supp. 308 (S.D.Fl.1988), aff'd, 943 F.2d 1477 (11th Cir.1991), cert. denied, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992), in which the United States District Court for the Southern District of Florida granted partial habeas corpus relief by ordering a new sentencing hearing of a capital trial after the trial court "took an active part in discussing the pros and cons *937 of presenting certain witnesses." Also, trial counsel failed to inform Blaco that any answers he gave to the judges's questions could be used against him at sentencing. The Blanco court found that counsel's performance was deficient. Clearly, this case does not present the egregious situation presented in Blanco.
Although we do not condone the trial court's actions in this case, we do not believe its actions amounted to plain error. After reading the entire record, we are confident that the trial judge's actions were motivated by his desire to ensure that Woods was given a complete and fair sentencing hearing. Any possible error served only to benefit Woods by allowing the presentation of an additional mitigation witness at the sentencing phase. We are certain that if error did occur it was harmless as it did not affect the substantial right of the appellant. Rule 45, Ala. R.App.P.

XIX.
Woods further argues that prosecutorial misconduct at the penalty phase denied him of a fair trial. He cites several instances of what he alleges was prosecutorial misconduct.

A.
Woods argues that the prosecutor improperly urged the jury to weigh the victim's rights against Woods's rights. He contends that the following argument was reversible error:
"He is afforded an opportunity as he sits here today that Dr. Rush Smith was not afforded. Dr. Smith was tried, convicted, and executed without the benefit of a jury of his peers. The only thing I would do on behalf of the State of Alabama, I would argue to you, and the Judge will charge you about weighing and I submit to you that the way this crime was carried outand you have spoken and said that Freddie Woods did it. That he took Dr. Smith's life in the course of robbery.... This case has taken days for you to hear all the evidence and for y'all to get where you are now to make these decisions. Dr. Smith's case took about an hour and forty-five minutes. That is about how long his fate was decided in. They rode around and drank and got gloves, and then rode up there for the very reason we have talked about, because Dr. Smith lived here all his life and he knew these people, and they couldn't leave a witness.... Dr. Smith was not murdered. He was executed. When you go back and weigh the mitigating that the Judge is going to charge you on against the aggravating in this case, you remember that. The State of Alabama, on behalf of the people of the State of Alabama, I tell you we want no sympathy. It has no place in your recommendation. The family of Dr. Rush Smith, I speak for themhis children, his grandchildren, his mother and the rest of the family that have been here this weekthey don't want sympathy. They want justice. Justice in this case is the jury in this case show Frederick Woods the same amount of mercy that he showed Dr. Smith up there in those few briefs seconds he was in that store."
This Court in McNair v. State, 653 So.2d 320 (Ala.Cr.App.), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), stated that a prosecutor should not argue that the victim's rights should be weighed against the rights of the accused. However, the McNair court also noted that, "we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation *938 of the verdict." We believe that the same analysis can be made of the arguments in this case.
Woods further contends that it was improper for the prosecutor to argue that the jury should avoid mercy and sympathy in its decision-making process. An argument similar to the one made in this case was recently upheld. Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999).

B.
Woods next argues that the following argument amounted to reversible error:
"I submit to you ladies and gentlemen of the jury that the aggravating circumstance in this casethe fact that they killed Mr. Smith in a robberywhen you weigh that and the circumstances attendant to this case, the way this was carried outand just like Mr. Livingston told you, Mr. Smith was not murdered. He was executed."
(Emphasis added.) Woods asserts that the highlighted portion of the argument urged the jury to consider nonstatutory aggravating evidence.
There was no objection to this comment made at trial; thus, we apply a plain-error analysis. Rule 45A, Ala.R.App.P.
A review of the comment and the entire argument show no plain error. It is clear from the prosecutor's argument that only one aggravating circumstance applied in the case, i.e., that the murder occurred during a robbery. Also, the trial court more than adequately instructed the jury to this effect. Last, the trial court on several occasions told the jury that arguments of counsel were not evidence in the case.

C.
Woods last urges us to find that the cumulative effect of the alleged improper arguments amounted to reversible error. We have held that when no one instance amounts to reversible error, the cumulative effect can be no greater. Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989).

XX.
Woods next argues that use of the robbery element of the capital offense as an aggravating circumstances violated his constitutional rights.
"Use of an element of the capital offense as an aggravating circumstance is known as `double-counting' or `overlapping' and has repeatedly been upheld. Stewart v. State, 730 So.2d 1203 (Ala.Cr. App.1996), aff'd, 730 So.2d 1246 (Ala. 1999); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burton v. State, 651 So.2d 641 (Ala.Cr. App.1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel, supra. This issue is without merit."
Hall, ___ So.2d at ___.

XXI.
Woods also argues that his death sentence was imposed pursuant to a pattern of racial biasthe victim was white and Woods is black. He argues in his brief to this Court: "Studies have shown that in cases such as Mr. Woods's, where the victim *939 is white and the defendant is black, the death penalty is far more likely to be sought and given. McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)." Woods's argument consists of only one paragraph and it fails to cite to any instance of alleged racial bias. Furthermore, a review of the record fails to support this assertion.

XXII.
Woods argues that Alabama's method of execution constitutes cruel and unusual punishment. He contends that the procedures and circumstances surrounding electrocution in Alabama are "qualitatively more cruel and unusual than any civilized society should tolerate." This issue was thoroughly addressed by this Court in Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App.1999), and rejected.

Trial Court's Sentencing Order

XXIII.
Woods also argues that Alabama's capital sentencing statute is unconstitutional because it does not state what weight the judge should give the jury's recommendation. This issue has repeatedly been addressed by this Court and determined adversely to Woods. In Whitehead v. State, 777 So.2d 781 (Ala.Cr.App.1999), this Court stated:
"Whitehead's first claim was addressed and rejected by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The Court in Harris held that `the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict.' 513 U.S. at 512, 115 S.Ct. at 1036. The court further held:
"`The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight.'
"513 U.S. at 515, 115 S.Ct. at 1037; see also Boyd v. State, 715 So.2d 825, 846 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
"Alabama's capital sentencing statute `adequately channels the trial court's discretion so as to prevent arbitrary results.' Bush v. State, 695 So.2d 70, 94 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citing Harris and rejecting claims that Alabama's statute permits a standardless override)."
See also McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1999); Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999); Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Cr.App.1998).

XXIV.
Woods also argues that the trial court's sentencing order was erroneous because the court failed to find that as mitigating Woods had a good employment history and that Woods was not able to appreciate the criminality of his actions.
Although evidence is presented concerning mitigation, the trial court is not obliged to find that that evidence is indeed mitigating. As we stated in Ingram v. State, 779 So.2d 1225, 1246 (Ala.Cr.App. 1999):
"Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d *940 874 (1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)...."
The trial court's sentencing order reflects that it considered all evidence presented in relation to mitigation. The trial court did not err in failing to find as mitigation Woods's employment history and that he was unable to appreciate the criminality of his conduct.

XXV.
Woods further argues that Alabama's system of limiting court-appointed attorneys $1,000 for out-of-court work violates the separation-of-powers doctrine, constitutes a taking without just compensation, deprives indigents of effective assistance of counsel, and violates the Equal Protection Clause of the United States and Alabama Constitutions.
"The Alabama Supreme Court, as well as this court, has addressed these same contentions in a number of previous cases and has consistently rejected them. See, e.g., Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985) (holding that Alabama's system for compensating appointed attorneys does not violate principles of due process or equal protection or a defendant's Sixth Amendment right to effective assistance of counsel); Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979) (holding that the system does not constitute an unlawful taking of property in violation of the Fifth Amendment, and does not violate the doctrine of separation of powers)."
Ingram, 779 So.2d at 1279.[5]

XXVI.
Last, Woods argues that the cumulative effect of all of the above-referenced errors entitled him to a new sentencing hearing. Because, we have found no error in any specific enumerated instance the cumulative effect can be no greater. Boyd, supra.

XXVII.

Appellate Review
Last, as required by § 13A-5-53, Code of Alabama 1975, we will address the propriety of Woods's conviction and his sentence to death by electrocution. Woods was indicted and convicted for murdering Smith during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2).
The record does not reflect that Woods's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1).
A review of the record shows that the trial court weighed all the aggravating evidence against the mitigating evidence and found that the aggravating circumstances outweighed the mitigating ones. The trial court found one aggravating circumstance, that the murder was committed during the course of a robbery. See § 13A-5-49(4). The trial court found as statutory mitigating circumstances that Woods had no significant history of prior criminal activity *941 and Woods's age, 19, at the time of the robbery-murder. See §§ 13A-5-51(1) and (7). The trial court considered the following to be nonstatutory mitigating evidence, "The Court considers the testimony of his family members, pastor of his church and others who knew him at an early age and their evidence of the defendant's good character and conduct prior to age 14." The trial court weighed these circumstances and sentenced Woods to death. After reviewing the record we agree with the trial court's findings.
However, pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of Woods's sentence to death. After an independent weighing, this Court is confident, as was the trial court, that Woods sentence of death is the appropriate sentence in this case.
Neither is Woods's sentence of death disproportionate or excessive to the sentences imposed in similar capital cases. As we have noted, "two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder. Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980)." McWhorter v. State, 781 So.2d 257 (Ala.Cr. App.1999).
Last, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error which may have adversely affected Woods's substantial rights and have found none.
Woods's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] Richard Foreman was also indicted and convicted for the capital murder of Smith. He was sentenced to life in prison without the possibility of parole. His conviction and sentence were affirmed by this Court by unpublished memorandum. On that direct appeal, the Court of Criminal Appeals spelled his name "Forman." Forman v. State, 778 So.2d 873 (Ala.Cr.App.1999) (table). [Note from the reporter of decisions: The Alabama Supreme Court spells this codefendant's name "Forman." See Ex parte Woods, 789 So.2d 941 (Ala.2001).]
[2] "The Criminal Code repealed Section 13-1-70 of the 1975 Alabama Code, defining the degrees of murder. Under the Criminal Code the degrees of murder are abolished and homicide is divided into murder, manslaughter and criminally negligent homicide. Sections 13A-6-2, -3, -4. However, the capital offense defined in Section 13A-5-31(a)(7) (repealed and replaced by § 13A-5-40(a)(7)) retains the crime of murder in the first degree as a component of that capital offense despite the fact that there is no crime of murder in the first degree defined by the criminal code." Williams v. State, 461 So.2d 834 (Ala.Cr.App. 1983), rev'd on other grounds, 461 So.2d 852 (Ala.), on remand, 461 So.2d 855 (Ala.Cr.App. 1984).
[3] We note that Woods, in his brief to this Court, argues that he attempted to supplement the record with the probation report but that it was never sent to this Court. Our records show that on April 1, 1998, a supplemental record that contained the probation report was filed in this Court.
[4] Cf. Robinson v. State, 698 So.2d 1160 (Ala. Cr.App.1996), cert. denied, 698 So.2d 1165 (Ala.1997). In Robinson this Court reversed the trial court's ruling admitting a confession because the only testimony from the State that the defendant had requested to speak with the officers was the hearsay testimony of a police officer who stated that someone in the jail had told him that the defendant wanted to speak with him. Also, this fact was disputed by Robinson's own testimony at the suppression hearing. This present case is clearly distinguishable from Robinson based on the reasoning of the Mosley court. In Robinson the accused invoked his right to counsel. See also Leatherman v. State, 666 So.2d 115 (Ala.Cr.App.1995).
[5] Section 15-12-21, Code of Alabama 1975, was recently amended to increase the attorney fees in appointed cases. As of June 10, 1999, an attorney working on a capital case in the circuit court has no cap on the total he can collect for his work.